No. 18,409.

R. M. PATTERSON, *Appellant,* v. THE IMPERIAL WINDOW GLASS COMPANY and THE CANEY WINDOW GLASS COMPANY, Interpleader, *Appellees.*

SYLLABUS BY THE COURT.

1. COURTS—*Inherent Powers—Abuse of Process.* Courts possess inherent power to prevent any abuse of their process.

2. SAME—*Will Not Entertain Action Based on Unlawful Conspiracy.* Whenever at any stage of the proceedings it is established to the satisfaction of the court that the cause of action upon which the plaintiff seeks to recover arose out of an unlawful conspiracy, it becomes at once the duty of the court to refuse to aid either party to profit by the iniquitous agreement.

3. SAME—*Form of Procedure—Immaterial.* Ordinarily the procedure in such a case would be to dismiss the action at the cost of the party bringing it; but the name given to the procedure is of no consequence if the action of the court be rightly taken.

4. ANTITRUST LAWS — *Unlawful Conspiracy in Restraint of Trade — Relief Properly Denied.* On the facts stated in the opinion it is held that the plaintiff's cause of action arose out of and was based upon an unlawful conspiracy in restraint of trade and in violation of the antitrust laws of the United States and of the provisions of chapter 257, Laws 1889, and the acts amendatory thereto, and that the court properly denied the plaintiff any relief.

Appeal from Montgomery district court; THOMAS J. FLANNELLY, judge. Opinion filed January 10, 1914. Affirmed.

*J. B. Tomlinson,* of Independence, for the appellant; *Charles D. Shukers,* of Independence, of counsel.    *

*T. H. Sanford,* and *G. T. Sanford,* both of Independence, for the appellees.

The opinion of the court was delivered by

PORTER, J.: The only question to be determined is whether the trial court rightly denied the plaintiff any relief on the ground that his cause of action grew out of and was based upon an unlawful conspiracy and upon transactions between plaintiff and defendant in violation of the antitrust laws. The question is largely one of procedure.

R. M. Patterson, the plaintiff, sued the Imperial Window Glass Company to recover the sum of $34,946.48 damages for breach of a written contract entered into between himself as lessor of the Osage Window Glass Company and the defendant. Certain property was attached as belonging to the defendant. The Caney Window Glass Company filed an interplea setting up a claim to the attached property, and alleged, among other things, that Patterson was a stockholder in the Imperial Window Glass Company; that it was a corporation organized in the state of West Virginia for the purpose of controlling the price and products of window glass factories and preventing competition in that class of merchandise; that the contract upon which the plaintiff sought to recover grew out of transactions between himself and the defendant which were in violation of the provisions of chapter 81, General Statutes 1909, against monopolies and unlawful combinations.

The cause came on for trial before the court on the interplea. Over the objections of plaintiff the court admitted in evidence an exemplified copy of an indictment and the record of proceedings thereunder filed April 7, 1910, in the district court of the United States for the western district of Pennsylvania against the

Imperial Window Glass Company and other defendants. There was endorsed on the exemplified copy the statement that on November 11, 1910, the several defendants in open court severally waived arraignment and entered a plea of *nolo contendere*. The name of R. M. Patterson did not appear in the record, but the Osage Window Glass Company, of which he was the lessee, was mentioned in the indictment as one of the corporations with which the Imperial Company had entered into an unlawful combination in restraint of trade.

The plaintiff and defendant separately demurred to the interpleader's evidence. The court sustained the demurrers, and at the same time held that all the parties were invoking the aid of the court in furtherance of an unlawful conspiracy, and that the court should not aid either of them, but leave them where it found them. In stating the reasons for the decision the court held that the demurrer of the plaintiff to the evidence of the interpleader should be carried back to the plaintiff's petition.

The plaintiff complains of this ruling, and insists that it is contrary to the rules of practice and of orderly procedure; that he has not had his day in court, and should have been permitted to introduce evidence. While we are not aware of any rule which would authorize a demurrer to evidence to be employed to search the whole record or to be carried back and sustained against a pleading, we think the procedure by which the court denied the plaintiff relief is of little importance. When at any stage of the proceedings it was established to the satisfaction of the court that the cause of action upon which the plaintiff sought to recover arose out of a transaction in violation of the antitrust laws, it became at once the duty of the court to refuse to aid either party to profit by the iniquitous agreement. Ordinarily the procedure would be to dismiss the action at the cost of the party bringing it. In

this case the court taxed the costs against the plaintiff, and the name given to the procedure is of no consequence if the action of the court was rightly taken.

In the contract upon which his cause of action is based, plaintiff agreed to manufacture glass upon the orders of the Imperial Window Glass Company, and to sell to that company the entire output of his factory for a certain period. He was to be paid a certain price when the product was delivered, but it was understood that there were to be semiannual adjustments of prices, by which he was to be paid any difference between the first price and the average price received by the Imperial Company from its customers.

With respect to prices, there was this further provision:

"In the event that the wages of skilled labor employed in the manfacture of window glass shall be increased or decreased, from the scale upon which these discounts are based, the above prices shall be governed thereby, and shall be increased or decreased, as the case may be, in proportion to the relative increase or decrease of the scale of such wages as understood by window glass manufacturers."

Severe penalties were imposed for his failure to sell all of his output to the Imperial Company. He was obliged to make daily reports of his business to that company, and it was to be permitted to audit his books and to examine his premises at any time to ascertain whether he had manufactured or sold any glass in violation of the contract. Patterson agreed that the brand of the Osage Window Glass Company should be placed on the boxes in which his product was shipped, but that the Imperial Company should give to its customers, as far as convenient and practicable, the brands of glass they had been accustomed to purchasing prior to the making of the agreement. Plaintiff was to subscribe for stock in the Imperial Company to the extent of $3,000. The concluding paragraph of the contract

provides that this stock was to be paid for by the Imperial Company and donated to the plaintiff, and likewise contains other provisions which throw additional light upon the character of the agreement. It reads:

"This contract shall become inoperative at such time as lease of the Osage Glass Company's plant at Independence, Kansas, terminates. Percentage of cost to conduct Imperial Window Glass Company's business shall be based on duration of said lease and final settlement with lessee shall be made within thirty days from termination of same, and stock subscribed for, amounting to three thousand dollars shall be paid for by Imperial Window Glass Company at final settlement."

The contract was signed by Patterson as lessee of the Osage Window Glass Company, party of the first part, and by Myron L. Case as president of the Imperial Window Glass Company, party of the second part.

The extent to which the Imperial Company controlled the market did not appear from the contract; but there was considerable oral evidence introduced on the hearing of the interplea from which it was shown that the company by means of similar contracts sought to control to a large extent the output and price of window-glass factories throughout the country. The president of the Imperial Window Glass Company testified that the principal owners of the stock of the company were individuals, most of whom were directly or indirectly interested in window-glass manufacturing plants, holding stock in the company for their plants which were located in Pennsylvania, New York, West Virginia, Ohio, Indiana, Illinois and Kansas; that these were the principal glass-producing states at that time; that the Imperial had but one contract with each company, usually a separate agreement, a stock subscription, which included a contract for the purchase of glass. F. E. Wear, who was interested in other glass manufacturing plants, as well as in the

Imperial Company, testified that the Imperial Company continued in business for about one year, and that it controlled forty or fifty per cent of the window-glass trade.

While the plaintiff objected to the introduction in evidence of the record of the indictment, no objection was interposed to the oral testimony showing quite fully the nature and extent of the business conducted by the Imperial Company. If, at the stage of the proceedings where the court indicated an intention to deny the plaintiff any relief, the plaintiff had offered or suggested that he had or could procure evidence to show that the contract had not been entered into for an unlawful purpose, or evidence in rebuttal of the oral testimony, it would have been the duty of the court to hear the evidence, and doubtless the court would have done so in this case. But no offer of that kind was made. The plaintiff objected to the judgment upon two grounds; first, that the court had no right to carry back to the petition a demurrer to evidence and sustain it; and second, that the court had no right to make the ruling without permitting him to introduce evidence in support of his cause of action. It appears, moreover, that instead of dismissing plaintiff's action at once, the learned trial judge proceeded with the utmost caution and deliberation, stating that while he would at once sustain the demurrer interposed by the plaintiff to the interplea, and believed he ought to carry the demurrer back to the petition and sustain it against the plaintiff because he was satisfied that all the parties were seeking the aid of the court in furtherance of an unlawful controversy and that it would be the duty of the court to leave them where it found them in their controversy, "but not being sufficiently advised in the premises, the court reserves its judgment upon the demurrer to plaintiff's said cause of action until a later adjourned date of the present term of this court." That was on the 19th day of June. On the

20th day of July following, and at the same term, the parties again appeared and the court for the reasons stated made the ruling complained of.

The plaintiff can hardly claim to have been surprised or prejudiced by the manner in which the ruling was made. It seems that he had ample time to have procured testimony if he desired to satisfy the court that the transaction upon which he was seeking to recover was not unlawful or that the contract itself had not been entered into in restraint of trade. If the ruling were reversed it would be merely for the purpose of giving to the plaintiff an opportunity first to offer proof to satisfy the trial court that he is not seeking the court's aid in furtherance of an unlawful transaction.

It was the intention of the antitrust act of 1889 (Laws 1889, ch. 257, and the acts amendatory thereto) that the courts should not be used to enforce any agreement or contract entered into in violation of that law. In *Barton v. Mulvane,* 59 Kan. 313, 317, 52 Pac. 883, it was said:

"Obviously the legislature intended that parties engaged in such an unlawful combination or trust should not use the law and its machinery to promote the unlawful combination or conspiracy, nor to enforce any agreement or contract growing out of it." (p. 317.)

There is no room for the plaintiff's contention that the contract upon which he sought to recover was collateral to and independent of the unlawful combination. The doctrine of *Connolly v. Union Sewer Pipe Company,* 184 U. S. 540, 46 L. Ed., 679, therefore, has no application. There the action was on a note for goods sold by the pipe company in the ordinary course of trade. Connolly, the purchaser, was not a member of the unlawful combination and in no way connected with it; and it was held that the fact that the plaintiff was a member of an unlawful trust and combination

was not available as a defense. A recent case in point is that of *Cont'l Wall Paper Co. v. Louis Voight & Sons Co.,* 212 U. S. 226, 53 L. Ed., 486. The authorities are reviewed in the opinion and it is held that a contract made with direct reference to and in execution of a combination intended to restrain and monopolize trade is a violation of the federal antitrust act.

It is unnecessary to inquire whether the record of the indictment against the defendant was properly admitted in evidence at the hearing of the interplea, or to determine whether a plea of *nolo contendere* may be given the same effect as a plea of guilty. From an examination of the contract, we have no hesitation in holding that it is one prohibited by the federal act (26 U. S. Stat. at Large, p. 209, ch. 647, 3 U. S. Comp. Stat. 1901, p. 3200), and likewise by the provisions of chapter 257 of the Laws of 1889 and the acts amendatory thereto. The court therefore had sufficient evidence without either the exemplified copy of the indictment or the oral testimony to authorize it to refuse the plaintiff any relief and to render judgment against him for costs.

"Every regularly constituted court has inherent power to do all things that are reasonably necessary for the administration of justice within the scope of its jurisdiction, and to prevent any abuse of its process." (8 A. & E. Encycl. of L. 28.)

*In Coppell v. Hall,* 74 U. S. 542, 19 L. Ed. 244, it was said:

"Whenever the illegality appears, whether the evidence comes from one side or the other, the disclosure is fatal to the case. No consent of the defendant can neutralize its effect. A stipulation in the most solemn form to waive the objection, would be tainted with the vice of the original contract, and void for the same reasons. Wherever the contamination reaches, it destroys. The principle to be extracted from all the cases is, that the law will not lend its support to a claim founded upon its violation." (p. 558.)

Referring to the public policy upon which this rule of law is founded, Mr. Justice Peckham, in the course of an opinion, said:

"To refuse to grant either party to an illegal contract judicial aid for the enforcement of his alleged rights under it tends strongly towards reducing the number of such transactions to a minimum. The more plainly parties understand that when they enter into contracts of this nature they place themselves outside the protection of the law, so far as that protection consists in aiding them to enforce such contracts, the less inclined will they be to enter into them. In that way the public secures the benefit of a rigid adherence to the law." (*McMullen v. Hoffman,* 174 U. S. 639, 669, 43 L. Ed., 1117, 1129.)

The court's ruling amounted to the same thing as dismissing the action at the costs of the plaintiff. The latter was not hurt by the name given to the procedure, and has no right to complain of the judgment denying him the aid of the court in furtherance of an unlawful transaction.

The judgment will be affirmed.